### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **OILFIELD DEVELOPMENT SPECIALISTS, LLC.** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| | § | |
| **V.** | § | **CIVIL ACTION NO. 4:19-CV-02930** |
| | § | |
| **CRESTLINE INVESTORS, INC.,** | § | |
| **PP EQUITY HOLDINGS, L.L.C.,** | § | |
| **MEDLEY CAPITAL, LLC, MEDLEY** | § | |
| **MANAGEMENT, INC., MEDLEY** | § | |
| **OPPORTUNITY FUND, L.P. AND** | § | |
| **FRONTERA ENERGY CORP.** | § | |
| | § | |
| **Defendants** | § | |
| | § | |

### OILFIELD DEVELOPMENT SPECIALISTS, LLC'S SECOND AMENDED COMPLAINT

### FILED IN THE ALTERNATIVE

1.      This Second Amended Complaint is filed in the alternative to Plaintiff Oilfield Development Specialists, LLC's Motion to Remand (Document 10). Oilfield respectfully urges that this case is not properly in federal court, and should be remanded for further proceedings.

### NATURE OF ACTION

2.      Plaintiff Oilfield Development Specialists, LLC owns an 1.84% overriding royalty interest in three Colombian oilfields (the "Colombian Prospect"). Oilfield's

1

ownership of the override has been confirmed by the United States District Court for the Southern District of Texas in multiple rulings and a partial judgment.

3.     Oilfield notified each of the Defendants that it owned an override in the Colombian Prospect and that they should forward Oilfield's override payments directly to Oilfield.  Defendants all refused to forward Oilfield its override and over the years have received, retained, and misdirected significant funds that belong to Oilfield.

4.     Since 2012, Defendants have conspired together and coordinated their efforts to deprive Oilfield of its override and in the process committed conversion, breached fiduciary duties, have been unjustly enriched, slandered Oilfield's title to the override, tortiously interfered with Oilfield's contracts, and made numerous fraudulent transfers to attempt to put the override payments beyond Oilfield's reach.

## JURISDICTION AND VENUE

5.     All Defendants have sufficient contacts with this district generally and with the events underlying this claim, so that they are subject to the exercise of both specific and general personal jurisdiction of this Court.  The facts supporting jurisdiction are detailed in the facts section of this complaint.

6.     Venue is proper in this judicial district.  A substantial part of the events giving rise to Oilfield's claims occurred in this district, as described in the facts section of this complaint.

## THE PARTIES

7.     Plaintiff Oilfield Development Specialists, LLC is a Louisiana limited liability company with its principal place of business at 1109 Hawthorne Street, Houston,

Texas 77006.

8.      Defendant Crestline Investors, Inc. is a corporation chartered under the laws of Delaware with its principal place of business at 201 Main Street Suite 1900, Fort Worth, Texas, 76102, where it can be served.

9.      Defendant PP Equity Holdings, LLC is a limited liability company chartered under the laws of Delaware with its principal place of business at 201 Main Street, Suite 1900 Fort Worth, Texas, 76102, where it can be served.

10.     Defendant Medley Capital, LLC is a New York limited liability company with its principal place of business at 280 Park Avenue, 6th Floor East, New York, New York, 10017.  This defendant can be served at that address through the Texas Secretary of State because this defendant engages in business in Texas, is not a Texas resident and does not have an designated agent for service of process in Texas, and this lawsuit arises from this nonresident defendant's business in Texas.

11.     Defendant Medley Management, Inc. is a New York corporation with its principal place of business at 280 Park Avenue, 6th Floor East, New York, New York, 10017.  This defendant can be served at that address through the Texas Secretary of State because this defendant engages in business in Texas, is not a Texas resident and does not have an designated agent for service of process in Texas, and this lawsuit arises from this nonresident defendant's business in Texas.

12.     Defendant Medley Opportunity Fund, LP is a New York limited partnership with its principal place of business at 280 Park Avenue, 6th Floor East, New York, New York, 10017.  This defendant can be served at that address through the Texas Secretary of

3

State because this defendant engages in business in Texas, is not a Texas resident and does not have an designated agent for service of process in Texas, and this lawsuit arises from this nonresident defendant's business in Texas.

13.     Frontera Energy Corporation is a corporation organized under the laws of Canada with its principal place of business at 333 Bay Street, Suite 1100, Toronto, Ontario, Canada, M5H2R2.   This defendant can be served at that address through the Texas Secretary of State because this defendant engages in business in Texas, is not a Texas resident and does not have an designated agent for service of process in Texas, and this lawsuit arises from this nonresident defendant's business in Texas.

## CONDITIONS PRECEDENT

14.     All conditions precedent to the Plaintiff bringing this suit are satisfied or have occurred.

## FACTS

15.     Dr. Luis Quintero is a Ph.D. petroleum engineer with extensive experience and contacts regarding South American oil and gas fields and prospects.  Dr. Quintero was the founder and manager of Oilfield, which was in the business of identifying and developing oil and gas prospects in North and South America.

16.     On August 1, 2006, Oilfield entered into a private agreement with an entity known as the Canaguaro Consortium, led by William Blackburn. The Canaguaro Consortium held the exclusive rights to develop three fields in the Colombia—the Quebrada Roja Field, the Toca Field, and the Canaguaro Contract Field (the "Colombian Prospect").  Oilfield was to acquire a working interest in the Colombian Prospect if it could

4

find suitable investors.

17.     Dr. Quintero had a business relationship with Cliff West and Robert Bensh. Bensh and West are residents of Houston, Texas and took all actions described herein in Houston, Texas.

18.     In 2006, Oilfield approached West and Bensh to inquire if they would be interested in a joint venture in the Colombian Prospect.  West and Bensh showed interest and wanted to know more.

19.     Oilfield, working out of its office in Houston, Texas, performed extensive analysis on information provided by the Canaguaro Consortium and confirmed that the Colombian Prospect was an attractive prospect for West and Bensh.

20.     Oilfield then decided to bring West and Bensh's company, Cardinal, into the deal as a joint venture partner.  From the outset, Oilfield was concerned that if it disclosed to Cardinal, West and Bensh that it had located an attractive prospect, Cardinal, West, and Bensh would try to go directly to the owner of the fields and attempt to cut Oilfield out of the deal.

21.     To assuage these concerns, Oilfield and Cardinal entered into the "Confidentiality Agreement" on August 1, 2006.  The purpose of this agreement was to establish that Cardinal and Oilfield would develop the Colombian Prospect together and that Cardinal would not seek to cut Oilfield out of the deal once Cardinal was introduced to the Canaguaro Consortium and William Blackburn.

22.     Cardinal agreed in the Confidentiality Agreement that neither it nor any of its affiliates would use any of the information or analysis that Oilfield disclosed, which

included the existence and location of the Colombian Prospect, for any purpose other than to enter into negotiations with Oilfield and the Canaguaro Consortium to participate in the Colombian Prospect.  Oilfield and Cardinal negotiated and signed the Confidentiality Agreement in Houston, Texas.  Oilfield performed its obligations under the Confidentiality Agreement in Houston, Texas.  Cardinal was aware that Oilfield had its primary offices in Houston, Texas and would be performing all the obligations under the Confidentiality Agreement in Houston.  The Confidentiality Agreement contains a choice of law provision in favor of Texas law.

23.     Once Cardinal and Oilfield entered into the Confidentiality Agreement, Oilfield introduced Cardinal to the Canaguaro Consortium and William Blackburn and Oilfield, Cardinal, and the Canaguaro Consortium began negotiations to develop the Colombian Prospect.  All these negotiations took place in Houston, Texas.

24.     Initially, Cardinal took the lead in the negotiations and sent a proposal letter to the Canaguaro Consortium on October 6, 2006, and a letter of intent on November 1, 2006. The letter originated from Cardinal's office in Houston, Texas.

25.     At some point, West, Bensh, and the other principles of Cardinal decided to form a new entity to develop the Canaguaro Block and formed an entity called Canaguaro Investors, LLC.  Canaguaro Investors, LLC was formed and controlled by Bensh and West.

26.     Canaguaro Investors, LLC sent a new letter of intent to the Canaguaro Consortium on January 4, 2007.  This letter also originated from Cardinal and Canaguaro Investors, LLC's offices in Houston, Texas.

27.     On March 19, 2007, Oilfield and Canaguaro Investors, LLC formalized their

6

agreement regarding the Canaguaro Block and signed the "Development Agreement." The Development Agreement acknowledged the past work Oilfield had performed in locating and analyzing the Canaguaro Block. It also stated that Oilfield will continue to assist Canaguaro Investors, LLC with the development of the block in the future. The Development Agreement stated its purpose was to "compensate Oilfield for its time and efforts" in locating, analyzing, and developing the Canaguaro Block opportunity. The parties negotiated and signed the Development Agreement in Houston, Texas. Oilfield performed all its obligations under the Development Agreement in Houston, Texas. Defendants performed all the obligations that they did not fail to perform under the Development Agreement in Houston, Texas.

28.     As compensation for Oilfield's past and future contributions to the joint venture, the Development Agreement granted Oilfield a 2% net overriding royalty interest in three fields located in the Colombian Prospect—the Quebrada Roja Field, the Toca Field, and the Canaguaro Contract Field. Oilfield later agreed to reduce its override to 1.84% to facilitate continued good graces with the Colombian government, which owned an 8% working interest in the Colombian Prospect and did not want to pay its share of the override.

29.     On March 6, 2007, Cardinal, West, and Bensh formed Condor Exploration, Inc. Condor was majority owned by Cardinal and directed by West and Bensh. Canaguaro Investors, LLC then merged into Condor Exploration, Inc.

30.     Over the ensuing months Condor repeatedly confirmed that it would recognize Oilfield's override in multiple emails, documents, and related contracts. Condor

disclosed the override to all its investors and field operators.  The principals of Condor had no intention of not paying Oilfield's override.

31.     From the very early stages of the investment, Defendants Medley Capital, LLC and/or Medley Management, Inc, and/or Medley Opportunity Fund (collectively "Medley")[1] were involved with Cardinal, Condor, and Oilfield.  Medley is an investment group ran by a small number of individuals.  These individuals were involved in the project from the start with the concept that they would ultimately fund the project though Condor.  The Medley principals made at least one trip to Columbia to work on the project and personally met with Dr. Quintero on multiple occasions.  Medley thus began a multifaceted 12-year relationship with Oilfield, Dr. Qunitero, Condor, the override, and the Columbian Prospect.  When Medley first became involved in the project, it knew that Oilfield and Condor were Texas companies and would both perform the majority of their contractual obligations in Texas.  Medley knew that Oilfield would evaluate and consult on the Columbian Prospect from its Houston, Texas office and that Condor would manage the project from its Houston offices.  Medley knew that the funds derived from the project, some of which belonged to Oilfield, would flow through Texas accounts.  Over the next 12 years, Medley communicated extensively with both Oilfield and Condor regarding the project in Texas through numerous emails and letters.  And as discussed below, Medley formulated the plan to defraud Oilfield out of its override knowing full well that they were defrauding a Texas company.

---

[1] Medley has a complicated structure that it uses to try and insulate itself from liability, but the same individuals operate the group of companies out of the same offices, and to the extent those companies are committing torts through their officers, directors, employees, or agents, the companies are committing them collectively.

32.     Medley funded the project and obtained total control over Condor by way of a series of transactions.  It then decided it did not want to pay Oilfield it's override.

33.     The Colombian Prospect began producing oil.  Oilfield contacted Condor and the field operators to arrange to begin receiving its override payments.  Medley retained lawyers to try and tie up the override in endless litigation rather than make the required payments.

34.     Oilfield sued Condor in Harris County District Court in January of 2012.  Medley engaged in continuous delay tactics in the litigation.  During these endless delays, Condor continued to collect and retain Oilfield's override payments and transfer those payments to Medley despite repeated demands to remit the payments to Oilfield.

35.     The evidence was overwhelming that Condor owed Oilfield the override.  Condor's former officers essentially testified that Condor owed the override, but Medley had directed them not to pay it.  The federal court ruled that Condor owed the override, including an August 21, 2015 Partial Judgment that stated that "Condor Exploration, Inc. will pay Oilfield Development Specialists, LLC a two-percent overriding royalty on the Canaguaro, Quebrada Roja, and Toca fields" and setting another hearing to determine the amount of past-due royalties Condor owed Oilfield.

36.     Despite these rulings, Condor continued to refuse to pay the override.  It did everything it could to drag the litigation out.  It then declared bankruptcy.  Since 2012 and until Medley sold Condor to Defendant Crestline Investments, Inc. sometime prior to 2015, Medley converted, retained, and misdirected Oilfield's override.  Medley has received millions of dollars from the Colombian Prospect through royalty payments and sales of

various interests and fraudulently transferred those funds to attempt to keep them out of Oilfield's reach.  Medley accomplished this through many, many communications and actions directed to Texas and Texas entities, and through its Texas attorneys.  The Crestline transaction was another step to distance itself from the override and involved more communications and dealings with Texas companies related to Oilfield and the override.

37.    At all relevant times, Medley directed Condor to commit its various wrongful acts from Condor's Houston offices.  Medley knew that Oilfield was a Houston company and that the override was negotiated in Houston, Oilfield performed its part of the Development Agreement in Houston, the federal court litigation confirming the override took place in Houston, and the override payments should have been delivered to Oilfield in Houston.  Medley directed the Houston lawyers representing Condor in the Houston litigation.  Medley sent its officer to Houston to testify in the Houston litigation.  Medley directed multiple communications to Houston concerning override and was aware it was converting funds from a Houston company.

38.    Medley's obstruction of Oilfield's override did not end with the Crestline transaction.  After the transaction, Medley continued to conspire with the other Defendants to put Oilfield's override payments out of reach, as described below.  Further, Medley has continued to engage in fraudulent transfers.  Funds related to the Crestline transaction would have amounted to transfers to avoid paying Oilfield its past due override payments.  Each time Medely exercised control funds rightfully belonging to Oilfield, Medley engaged in transfers intended to hinder or defraud Oilfield.  These fraudulent transfers began in 2008, and, on information and belief, continue to this day or until very recently.

39.     Defendant Crestline Investors, Inc., possibly acting through its affiliate PP Holdings, LLC (collectively "Crestline") purchased Condor from Medley sometime prior to 2015.   Crestline had the opportunity to work with Oilfield to resolve the override litigation.   Crestline was fully aware of the override and the federal court order ordering Condor to pay it.   But Condor and Medley's lawyers convinced Crestline to continue paying them to continue their endless delay tactics so that Crestline stepped into Medley's shoes and continue converting the override.   Since at least 2015, Crestline has continued to convert Oilfield's override.

40.     Crestline's principal place of business is in Dallas, Texas.   At all relevant times, Crestline knew that Oilfield was a Houston company and that the override was negotiated in Houston, Oilfield performed its part of the Development Agreement in Houston, the federal court litigation confirming the override took place in Houston, and the override payments should have been delivered to Oilfield in Houston.   Crestline appeared in Houston to mediate the case.

41.     Since 2012, Oilfield has been diligently notifying every field operator and third party that has received Oilfield's override payments that it owns the override and the payments should be directed to Oilfield, not Condor.

42.     But Condor, Medley, and Crestline have threatened, cajoled, and indemnified field operators to continue sending Oilfield's override to Condor.

43.     Defendant Frontera has been the field's operator since at least early 2017.   On June 22, 2017, Oilfield sent Frontera a detailed letter explaining that Oilfield owned the override and demanding that Frontera honor the override and make payments directly

11

to Oilfield.  The letter attached the various federal court orders and opinions that confirmed the override was valid and owing.  Oilfield followed up with additional letters, phone calls, and emails.  It offered to meet and mediate the issue with Frontera.  Frontera contacted Condor and Crestline who convinced Frontera not to pay the override and to join Condor in its campaign to delay and obstruct Oilfield's rights.  On information and belief, Frontera had a financial incentive not to pay the override.  Condor owed Frontera working interest contributions that Frontera was likely deducting out of Condor's share of the field proceeds.  If Frontera sent Oilfield's override to Oilfield, it would significantly reduce Condor's share of the proceeds, and thus significantly impair Frontera's ability to deduct working interest payments from those proceeds.  As such, for over two years now, Frontera has been knowingly converting Oilfield's override payments for its own benefit.

44.     Frontera was specifically notified that Oilfield was a Houston company and it was converting property that rightfully belonged to Oilfield in Houston.  Frontera knew that Oilfield was a Houston company and that the override was negotiated in Houston, Oilfield performed its part of the Development Agreement in Houston, the federal court litigation confirming the override took place in Houston, and the override payments should have been delivered to Oilfield in Houston.  Frontera directed multiple communications to Oilfield in Houston concerning the override.   And Frontera has recently made an appearance in the related Condor bankruptcy proceeding in Dallas, Texas, thereby submitting to personal jurisdiction in Texas.

## FIRST CLAIM FOR RELIEF
### Conversion

45.     Plaintiff incorporates the allegations contained in the preceding paragraphs here.

46.     Oilfield owned the override payments and had an immediate right to possess them.

47.     The override payments were specific chattel because they were delivered to Defendants with the intent that they safekeep them and remit them to Oilfield, they were to be kept segregated from other funds, Defendants were supposed to remit them to Oilfield in an intact fund, and Defendants had no claim to title of the payments.  Further, the oil and gas severed from the Colombian prospect was Oilfield's specific chattel that Defendants converted by selling and then refusing to remit the proceeds of the sale to Oilfield.

48.     Defendants wrongfully exercised dominion and control over the property as described above.

49.     Oilfield has suffered injury because it has been denied its override payments.

50.     Defendants actions were willful and intentional, and Oilfield seeks exemplary damages as well as compensatory damages for Defendants' conversion.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment

51.     Oilfield incorporates the allegations contained in the preceding paragraphs here.

52.     A defendant is liable under an unjust enrichment theory when it retains money or property that in equity and good conscience belongs to the plaintiff.

53.     As established above, Defendants have all retained money or property that in

equity and good conscience belongs to Oilfield.

54.     Oilfield seeks compensatory and exemplary damages for Defendants' unjust enrichment.

## THIRD CLAIM FOR RELIEF
### Breach of the Fiduciary Duty

55.     Plaintiff incorporates the allegations contained in the preceding paragraphs here.

56.     Each Defendant at some point held money or property in trust that rightfully belonged to Oilfield.  As such, they obtained fiduciary duties as trustees to safeguard that property and deliver it to Oilfield.

57.     Defendants owed to Oilfield a fiduciary duty that requires proof of "perfect fairness" on the part of Defendants in all representations and disclosures that Defendants made to Oilfield and all transactions entered into with or on behalf of Oilfield.  Defendants were prohibited from self-dealing or placing their interests above Oilfields.

58.     The relationship between Defendants and Oilfield is rife with potential for overreaching.   For this reason, where self-dealing by the defendants is alleged, a presumption of unfairness automatically arises and the burden is placed on the Defendants to prove (a) that the questioned transaction was made in good faith, (b) for consideration, and (c) after full and complete disclosure of all material information to Oilfield.

59.     By the actions described above, Defendants breached their fiduciary duties owed to Oilfield by self-dealing, failure to disclose, and misrepresentation.

60.     Oilfield has been damaged because it has not received its override payments.

61.     Oilfield seeks compensatory and exemplary damages as well as the equitable remedy of disgorgement for Defendants' breaches of fiduciary duty.

## FOURTH CLAIM FOR RELIEF
### Suit to Quiet Title

62.     Oilfield incorporates the allegations in the above paragraphs by reference.

63.     Oilfield enjoys right, title, and interests in and to the Colombian Prospect under the Development Agreement and subsequent agreements.  By denying Oilfield's rights with respect to its override and retaining that override for themselves, each Defendant has made claims with respect to the Oilfield's property that are invalid and have clouded and adversely affected Oilfield's rights, title, and interests in and to its property.

64.     Oilfield thus requests an order quieting title to the override and striking all claims by Defendants to the override.

## FIFTH CLAIM FOR RELIEF
### Slander of Title

65.     Oilfield incorporates the allegations in the above paragraphs by reference.

66.     Defendants' above-described conduct constitute slander of title.  Oilfield has superior rights, title, and interests in and to the override.  Defendants, maliciously and without justification or privilege, published false and disparaging statements regarding Oilfield's rights, title, and interests in and to the override by communicating to others that Oilfield did not own the override, which convinced others not to honor the override.  As a direct and proximate result of Defendants' publication of disparaging statements, Oilfield has suffered pecuniary loss and special damages, including but not limited to, loss of the override payments.

15

67.     Oilfield seeks compensatory and exemplary damages for Defendants' slander of title.

## SIXTH CLAIM FOR RELIEF
### Declaratory Judgment

68.     Oilfield incorporate the allegations in the above paragraphs by reference.

69.     Oilfield requests that the Court enter a judgment declaring the rights, title, and interests in and to the override.  Specifically, Oilfield seeks a declaration that it is the rightful owner of the override and that all field operators, including but not limited to Frontera, must pay the override directly to Oilfield.

70.     Oilfield seeks its attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code.

## SEVENTH CLAIM FOR RELIEF
### Tortious Interference with Existing Contract

71.     Oilfield incorporates the allegations in the above paragraphs by reference.

72.     Defendants' above-described conduct constitutes tortious interference with Oilfield's existing contracts.  Oilfield had valid contracts with Condor, specifically the Development Agreement and the Confidentiality Agreement.  Each Defendant was made specifically aware of those contracts and willfully and intentionally interfered with the contracts by hindering performance of the contract and, ultimately, causing and facilitating breach of the contract.  These actions included but were not limited to directing, inducing, or pressuring Condor not to pay the override, and/or transferring Oilfield's override payments to other parties with full knowledge that those other parties would choose not to remit those payments to Oilfield in breach of the Development Agreement.  As a result of

Defendants' tortious interference, Oilfield has suffered and continues to suffer damages.

73.     Oilfield seeks compensatory and exemplary damages for Defendants' tortious interference.

## EIGHTH CLAIM FOR RELIEF
### Conspiracy

74.     Oilfield incorporates the allegations in the above paragraphs by reference.

75.     As detailed above, Defendants combined to accomplish an unlawful objective—wrongfully cheating Oilfield out of its override. Defendants had a meeting of the minds with respect to that objective—they each had discussions between and amongst themselves and through their common lawyers, which often included indemnity agreements related to the override, and decided collectively to facilitate the non-payment of the override.  They committed unlawful and overt acts to accomplish that objective by the numerous torts described herein.  As a result, Oilfield has suffered and continues to suffer damages.

76.     Oilfield seeks compensatory and exemplary damages for Defendants' conspiracy.

## NINTH CLAIM FOR RELEIF
### Fraudulent Transfer

77.     Oilfield incorporates the allegations contained in the preceding paragraphs here.

78.     By the actions described above, Defendants violated the Texas Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.000 (the "TUFTA").

79.     Specifically, Defendants violated § 24.005(a)(1) of the TUFTA by entering into the above-described transactions with an actual intent to hinder, delay or defraud Oilfield.

80.     Defendants transferred funds, as described above, to the other Defendants with the intent to defraud Plaintiffs.  Each Defendant at some point came into possession of Oilfield's override payments or property at a time when each Defendant had specific knowledge that that money or property belonged to Oilfield.  Each Defendant then chose to transfer that money or property to another with knowledge that the other would not remit it to Oilfield.  Further, each Defendant was the recipient of fraudulently transferred funds, and Defendants Medley and Crestline have further fraudulently transferred additional funds, such as the sales proceeds from selling interests in the Colombian Prospect, to other parties to avoid subjecting those funds to a judgment in Oilfield's favor.

81.     Plaintiffs seek their actual and exemplary damages as well as reasonable attorneys' fees under the TUFTA.

**<u>TENTH CLAIM FOR RELIEF</u>**
**Exemplary Damages Pursuant to**
**Tex. Civ. Prac. & Rem. Code Chapter 41**

82.     Oilfield incorporates the allegations contained in the preceding paragraphs here.

83.     Upon the jurors' finding of actual damages with respect to any of Oilfield's causes of action in which punitive or exemplary damages are available, Oilfield seeks an award of exemplary damages pursuant to TEX. CIV. PRAC. & REM. CODE § 41.003.

84.     There is clear and convincing evidence of Defendants' gross negligence and

malice in committing the various torts as set forth above.  Oilfield is therefore entitled to an award of exemplary damages against Defendants, and Oilfield seeks this award of exemplary damages in addition to its actual damages and Defendants' disgorgement of fees and benefits.

## ELEVENTH CLAIM FOR RELIEF
### Accounting

85.     Oilfield incorporates herein the allegations contained in the preceding paragraphs.

86.     Because a fiduciary relationship exists between Oilfield and Defendants, Defendants have a duty to fully disclose any information regarding the override payments they retained.

87.      Oilfield demands an accounting for the override payments related to the Colombian Prospect from each Defendant.

## TWELFTH CLAIM FOR RELIEF
### Constructive Trust.

88.     Oilfield incorporates herein the allegations contained in the preceding paragraphs.

89.     By knowingly taking possession of Oilfield's property and funds, Defendants created a constructive trust over those funds.  Defendants breached that trust by not safeguarding the property or funds and keeping it for themselves.  Oilfield was damaged because it has been deprived of its property and funds.

## DISCOVERY RULE, FRAUDULENT CONCEALMENT, RELATION BACK,

19

## AND CONTINUING TORT DOCTRINE

90.     Oilfield pleads the discovery rule and fraudulent concealment to toll all applicable statutes of limitations.  As described above, Defendants actively concealed their wrongful conduct until after this lawsuit was filed by mispresenting facts to Oilfield and refusing to disclose to Oilfield pertinent information about its override and all the transactions that affected the override and ownership in the Colombian Prospect.

91.     Oilfield additionally pleads the continuing tort doctrine.  As described above, Defendants acted in concert in a pattern of continuing tortious conduct that continues to this day intentionally designed to delay the Oilfield's receipt of the override for as long as possible.

92.     Oilfield pleads the relation back doctrine.  Oilfield originally filed suit relating to this series of transactions in 2012, and Oilfield's allegations related back to that date.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Awarding Plaintiff its damages for Defendants' wrongful acts complained of;

B. Granting equitable relief in the form of disgorgement of any fees or benefits Defendants received;

C. Awarding Plaintiff exemplary damages as provided by Tex. Civ. Prac. & Rem. Code Chapter 41;

D. Granting Plaintiff reasonable attorneys' fees under § 27.01(e) of the Texas Business Commerce Code and Chapter 38 of the Texas Civil

Practice and Remedies Code;

E.  Ordering an accounting; and

F.  Granting such other and further relief, including pre-judgment and post-

judgment interest, as this Court deems just and proper.

## JURY TRIAL DEMANDED

93.  Plaintiff hereby demands a trial by jury for its claims.


Respectfully submitted,

**WARE, JACKSON, LEE, O'NEILL,
SMITH & BARROW, LLP**


By: _/s/ Paul Smith_____
    Paul W. Smith
    Texas Bar No. 18662700
    S.D. Bar No. 12587
    paulsmith@warejackson.com
    2929 Allen Parkway, 39th Floor
    Houston, Texas 77019
    Telephone: (713) 659-6400
    Facsimile: (713) 659-6262

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**


OF COUNSEL:

Timothy R. Lankau
State Bar No. 24046267
S.D. Bar No. 660008
timlankau@warejackson.com
2929 Allen Parkway, 39th Floor
Houston, Texas 77019
Telephone: (713) 659-6400
Facsimile: (713) 659-6262

## **CERTIFICATE OF SERVICE**

      This is to certify that a true and correct copy of the above and foregoing document is being automatically served on all known Filing Users in this matter through the Court's Notice of Electronic Filing Service, on this the 16th day of September 2019, and all parties or counsel who are not a Filing User by United States first class mail, postage prepaid. A copy of the foregoing is also being sent by email to the following:

    Charles S. Kelley
    700 Louisiana Street, Suite 3400
    Houston, Texas 77002-2730
    (713) 238-2634
    (713) 224-4634 (Facsimile)
    ckelley@mayerbrown.com

    Quincy McNeal
    700 Louisiana Street, Suite 3400
    Houston, Texas 77002-2730
    (713) 238-2634
    (713) 224-4634 (Facsimile)
    qmcneal@mayerbrown.com

                           */s/ Timothy R. Lankau*
                           Timothy R. Lankau